Alger, et al. v. Dept. of Labor & Industry, et al. (2005-001)

2006 VT 115

[Filed 09-Nov-2006]


 NOTICE: This opinion is subject to motions for reargument under
 V.R.A.P. 40 as well as formal revision before publication in the Vermont
 Reports. Readers are requested to notify the Reporter of Decisions,
 Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801 of
 any errors in order that corrections may be made before this opinion goes
 to press.


 2006 VT 115

 No. 2005-001


 Rebecca Alger, et al. Supreme Court

 On Appeal from
 v. Franklin Superior Court


 Department of Labor and Industry, et al. November Term, 2005


 Howard E. VanBenthuysen, J.

 Maryellen Griffin and Karen Richards, and Katherine Berkman and Stephen
 Norman (On the Brief), St. Johnsbury, for Plaintiffs-Appellants.

 William H. Sorrell, Attorney General and Clifford Peterson, Assistant
 Attorney General, Montpelier, for Defendants-Appellants.


 PRESENT: Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.

 
 ¶ 1. JOHNSON, J. Plaintiffs Rebecca Alger, et al., appeal from the
 superior court's dismissal of their action against defendant Vermont
 Department of Labor and Industry, as well as from the court's denial of
 their application for class certification. Plaintiffs' claims arise
 primarily from the Department's attempted closure of an apartment building
 at 13 High Street in St. Albans for longstanding housing code violations. 
 Plaintiffs allege that the conditions at 13 High Street are symptomatic of
 the Department's general failure to take action against the owners of
 rental housing who have violated the housing code. (FN1) Plaintiffs claim
 that the closure was an unconstitutional taking of property without due
 process or just compensation. They argue that the court's dismissal was
 premature because their allegations were sufficient to state due process
 and takings claims, as well as a claim in the nature of mandamus. 
 Plaintiffs also contend that the court improperly considered the merits of
 the case in denying class certification. We affirm in part, reverse in
 part, and remand.

 ¶ 2. Plaintiffs brought this action in November 2002, following the
 Department's order that the apartment building at 13 High Street be vacated
 by November 15, 2002, due to fire and electrical code violations. 
 Plaintiffs' first complaint sought declaratory and injunctive relief
 pursuant to 21 V.S.A. § 209, which allows any person aggrieved by an action
 taken by the Commissioner of Labor and Industry to appeal the action to the
 superior court within twenty days of the action. The complaint alleged
 that the Department's order failed to comply with the due process
 requirements of notice and a pre-closure hearing, that it was served
 improperly, and that the Department had failed to demonstrate that the
 building was imminently hazardous before ordering that it be vacated. In
 connection with their complaint, plaintiffs sought, and received, a
 preliminary injunction preventing the Department from closing the building. 
 The Department then agreed to allow the building to remain open until
 further order of the superior court. Plaintiffs filed a second amended
 complaint adding claims against Thomas Komasa, the owner of 13 High Street,
 after he was brought in as a third-party defendant at the Department's
 request. Plaintiffs' claims against Mr. Komasa, some of which have been
 settled, are not at issue here. 

 ¶ 3. In June 2003, following discovery, plaintiffs filed a third
 amended complaint containing revised claims and additional allegations
 against the Department. This complaint also added the claims of two
 plaintiffs, Tina Neville and Linda Limoge, who did not reside at 13 High
 Street. We treat the following allegations as true for the purposes of
 reviewing the superior court's dismissal. Gilman v. Maine Mut. Fire Ins.
 Co., 2003 VT 55, ¶ 14, 175 Vt. 554, 830 A.2d 71 (mem.).
 
 ¶ 4. On October 14, 2002, the Department issued an order regarding
 numerous fire and electric code violations at 13 High Street. The order
 cited "a long history of violations" at that building that had been
 identified no later than 2000, although it did not include previous
 inspections from as far back as 1994 that had identified similar
 violations. According to the October 14, 2002 order, the Department had
 instructed the building's previous owner, Brian Simpson, to correct similar
 violations in May 2000, notified him of continuing violations in July 2000,
 and ordered him to correct the violations within thirty days in November
 2000. When Mr. Simpson failed to correct the violations, the Department
 asked, in April 2001, that he submit a plan of corrective action within
 thirty days, and noted in a report that the violations continued to exist
 as of August 2001. Chittenden Bank acquired the building from Mr. Simpson
 in 2002 by foreclosure, and sold it to Mr. Komasa in May 2002. In June
 2002, Department personnel met with Mr. Komasa and informed him of the
 continuing code violations. Mr. Komasa told them that he would correct the
 violations, but on September 11, 2002, a Department inspection found "no
 evidence that any work had been done toward improving the condition of the
 building." 

 ¶ 5. The October 14, 2002 order directed Mr. Komasa to: (1)
 immediately vacate apartment 5, the residence of plaintiff Laura Bean,
 because it no longer had electrical service and plaintiff Bean was using
 candles to light the apartment; (2) submit a plan of corrective action by
 October 21, 2002; and (3) begin repairs to correct the violations no later
 than November 1, 2002. The order stated that noncompliance would result in
 the closure of the building "until such time as all outstanding violations
 are corrected." The order was handed to plaintiff Corinne Bluto, who lived
 on the third floor, and wedged into the doorway of plaintiffs Alger and
 Todd Massey. 
 
 ¶ 6. Plaintiff Bean vacated her apartment in October 2002. 
 Plaintiffs Bluto, Alger, and Massey remained in their apartments. Although
 Mr. Komasa received an informal extension of the deadline for submitting a
 plan of corrective action until November 1, 2002, he did not submit such a
 plan by that date, and he took no action to begin correcting the
 violations. On November 5, 2002, the Department issued an order that the
 building be closed and its electrical service disconnected as of November
 15, 2002. The order did not contain a statement that there was an imminent
 hazard. The Department did not provide plaintiffs an opportunity for a
 hearing prior to the closure date, and did not offer plaintiffs assistance
 in relocating or other compensation for the loss of their apartments. The
 Department took no additional action against Mr. Komasa, such as the
 imposition of administrative fines, and did not refer the case to the
 Franklin County state's attorney for civil or criminal prosecution. 

 ¶ 7. Plaintiffs' complaint also contained allegations on behalf of
 plaintiffs Neville and Limoge, neither of whom shared plaintiffs' claims
 with respect to 13 High Street. Plaintiff Neville alleged that she had
 vacated her rental home because of numerous uncorrected code violations,
 all of which the Department had identified through inspections, but none of
 which the Department had ordered her landlord to correct. Plaintiff Limoge
 alleged that she was forced to vacate her rented mobile home when the
 Department disconnected her electrical service due to her landlord's
 failure to correct electrical code violations. The Department took no
 action against either landlord before or after plaintiffs Neville and
 Limoge left their homes. 
 
 ¶ 8. Plaintiffs' third amended complaint no longer relied on 21
 V.S.A. § 209. Instead, the complaint phrased plaintiffs' legal claims in
 terms of the Department's failure to perform its mandatory statutory
 duties, and its failure to exercise discretion in performing its
 discretionary duties. The complaint alleged that the Department
 "arbitrarily abused [its] authority to enforce the habitability statutes
 and rules by failing and neglecting to take action to cause violations to
 be eliminated or removed in accordance with the statutes and rules," failed
 to establish or follow a procedure for penalizing landlords who fail to
 correct code violations, and failed to establish or follow a procedure for
 legal action against such landlords. Plaintiffs alleged that the
 Department's actions were consistent with its general failure to enforce
 the housing code except by evicting tenants in rental housing. That is,
 the Department rarely, if ever, issued fines or referred a landlord for
 prosecution, despite its statutory authority to do so, even after closing a
 rental property. The amended complaint also contained the previous
 complaints' claims that the Department took plaintiffs' property without
 due process or just compensation by terminating plaintiffs' residential
 tenancies without providing a pre-closure hearing or taking effective
 action to force landlords to correct the violations that resulted in the
 closures. (FN2)
 
 ¶ 9. Plaintiffs also moved to certify a class of similarly situated
 tenants and a subclass of tenants who had suffered the loss of their rental
 housing. Plaintiffs' motion for class certification defined the class as
 "all residents of rental housing in Vermont where there are one or more
 violations of the statutes and rules pertaining to habitability and
 enforced by [the Department]," including "all people who now reside in such
 housing, all people who have resided in such housing since November 13,
 1999, and all people who will reside in such housing in the future." The
 subclass was composed of "all Vermont residential tenants who have in the
 past three years, or will in the future, be forced to move out of their
 homes as a result of [the Department's] actions and omissions regarding
 code enforcement in rental housing." The Department opposed class
 certification, and the superior court denied plaintiffs' motion, finding
 that plaintiffs' proposed class failed to meet the requirements of Vermont
 Rule of Civil Procedure 23. 
 
 ¶ 10. The Department also filed a motion to dismiss under Rule
 12(b)(6), arguing that the allegations in plaintiffs' complaint were
 insufficient to state a claim for which relief could be granted. The
 superior court granted the Department's motion and dismissed plaintiffs'
 claims, ruling that the Department's action in forcing plaintiffs to vacate
 their rental housing was an exercise of the police power, not subject to
 due process or takings analysis, and that plaintiffs' claims that the
 Department had abused its authority, which were in the nature of the writ
 of mandamus, were not properly brought under Rule 75. Even had plaintiffs
 followed the procedures of Rule 75, the court stated that their allegations
 were legally insufficient because the Department's duty to act was
 discretionary, and any failure to act was not "an arbitrary abuse of
 power." See Sagar v. Warren Selectboard, 170 Vt. 167, 171, 744 A.2d 422,
 426 (1999) (stating that mandamus is not generally available for
 discretionary decisions absent an arbitrary abuse of power).


 ¶ 11. Plaintiffs now appeal the court's dismissal of their complaint
 and its denial of their motion for class certification. They argue that
 the court erred by: (1) dismissing their complaint despite allegations that
 were sufficient to state mandamus, takings, and due process claims against
 the Department; and (2) improperly considering the merits of their
 complaint in denying their motion for class certification. We agree that
 the court's dismissal of plaintiffs' claims was premature, but find that
 denial of class certification was appropriate here, and therefore, we
 affirm in part, reverse in part, and remand for further proceedings.

 I.

 ¶ 12. Plaintiffs first contend their complaint should have survived
 a motion to dismiss because it stated claims upon which relief could be
 granted. "A motion to dismiss is not favored and rarely granted." Gilman
 v. Maine Mut. Fire Ins. Co., 2003 VT 55, ¶ 14, 175 Vt. 554, 830 A.2d 71
 (mem.). This is especially true "when the asserted theory of liability is
 novel or extreme," as such cases "should be explored in the light of facts
 as developed by the evidence, and, generally, not dismissed before trial
 because of the mere novelty of the allegations." Ass'n of Haystack Prop.
 Owners, Inc. v. Sprague, 145 Vt. 443, 447, 494 A.2d 122, 125 (1985). In
 reviewing a motion to dismiss, we consider whether, taking all of the
 nonmoving party's factual allegations as true, " 'it appears beyond doubt'
 that there exist no facts or circumstances that would entitle the plaintiff
 to relief." Amiot v. Ames, 166 Vt. 288, 291, 693 A.2d 675, 677 (1997)
 (quoting Levinsky v. Diamond, 140 Vt. 595, 600-01, 442 A.2d 1277, 1280-81
 (1982)). We treat all reasonable inferences from the complaint as true,
 and we assume that the movant's contravening assertions are false. (FN3)
 Id.
 
 A.

 ¶ 13. We first address plaintiffs' claim that the Department failed
 to enforce the housing code, which plaintiffs characterize as a claim in
 the nature of mandamus. Although Rule 81(b) abolished the writ of
 mandamus, relief in the nature of mandamus remains available under Rule 75. 
 Garzo v. Stowe Bd. of Adjustment, 144 Vt. 298, 299-300, 476 A.2d 125, 126
 (1984). The superior court faulted plaintiffs for failing to proceed under
 Rule 75, but plaintiffs did not fail to satisfy any requirement of Rule 75
 by simply filing a complaint demanding a mandatory injunction. To the
 extent Rule 75 alters the requirements of mandamus, it relaxes its formal
 requirements-for instance, by eliminating responsive pleading requirements
 at the discretion of the court, and by allowing amendment to permit a
 defective Rule 75 claim to be brought as an ordinary civil action. 
 V.R.C.P. 75(b). 
 
 ¶ 14. The Department interprets the court's statement as a ruling
 that plaintiffs' claims were brought outside the statute of limitations. 
 We see no indication of such reasoning in the court's ruling. The
 limitations period set by Rule 75 with respect to failures to act is "six
 months after expiration of the time in which action should reasonably have
 occurred." V.R.C.P. 75(c). This time limit, however, is not
 jurisdictional, Fyles v. Schmidt, 141 Vt. 419, 422, 449 A.2d 962, 964
 (1982), and the Department raises it for the first time on appeal. The
 only time bar raised below was with respect to plaintiffs' challenge under
 21 V.S.A. § 209; the Department failed to address any applicable bar to
 plaintiffs' mandamus claims, and responded to these claims only in terms of
 its lack of a mandatory duty. We thus decline to address this issue on
 appeal. See Rennie v. State, 171 Vt. 584, 587, 762 A.2d 1272, 1277 (2000)
 (refusing to consider a statute of limitations argument that was not
 specifically raised below, even though the same issue had been raised with
 respect to related claims). 

 ¶ 15. Perceiving no procedural default, we turn to the substance of
 plaintiffs' complaint. Mandamus will ordinarily lie only "to compel a
 public officer to perform an official act which is merely ministerial," and
 only where "the right sought to be enforced is certain and clear." Roy v.
 Farr, 128 Vt. 30, 34, 258 A.2d 799, 801-02 (1969). This rule is subject to
 the exception, however, that where there is "an arbitrary abuse of the
 power vested by law in an administrative officer or board which amounts to
 a virtual refusal to act or to perform a duty imposed by law, mandamus may
 be resorted to in the absence of other adequate legal remedy." Id., 258
 A.2d at 802.

 ¶ 16. Although the fire, electrical, and plumbing safety codes are
 each addressed by a separate statutory scheme, the enforcement provisions
 of each are similar. Each code explicitly commits enforcement to the
 discretion of the Department by allowing the Commissioner of Labor and
 Industry to set priorities for inspection and enforcement. See 21 V.S.A. §
 252(b) (2003) (FN4) (allowing the commissioner to "establish priorities for
 enforcing these rules and standards based on the relative risks to persons
 and property from fire or particular types of premises"); 26 V.S.A. § 893
 (allowing the commissioner to set electrical inspection priorities); id. §
 2173(b) (allowing the commissioner to set priorities for plumbing
 inspection and enforcement). 
 
 ¶ 17. Each code also empowers the Department to respond to
 violations in several ways. Each contains a provision authorizing an
 administrative fine of not more than $1,000 for each violation of a rule or
 order. 21 V.S.A. § 254(c) (2003) (fire); 26 V.S.A. § 897(a) (electrical);
 id. § 2175(d) (plumbing). In addition, each authorizes action in the
 superior court to enforce a regulation or order by injunctive relief and,
 in the case of fire code violations, fines of up to $20,000. 21 V.S.A. §
 254(a)-(b) (allowing superior court prosecution for injunctive or other
 relief and fines of up to $10,000 for a violation of any provision and
 $20,000 for a violation of an emergency order); 26 V.S.A. § 897(b)
 (authorizing the superior court, "on application by the commissioner," to
 grant injunctive relief for electrical code violations); id. § 2175(e)
 (authorizing the superior court, "[o]n application by the commissioner," to
 enjoin plumbing code violations. (FN5) Each scheme also authorizes the
 Department to issue an order to the owner of the premises to correct a
 violation. 21 V.S.A. § 253(a) (fire); 26 V.S.A. § 895 (electrical); id. §
 2175(b)(1) (plumbing). If a fire code violation is not corrected following
 an order, the building may be closed. 21 V.S.A. § 253(a). An uncorrected
 plumbing or electrical violation may result in the disconnection of
 service. 26 V.S.A. § 895 (electrical); 26 V.S.A. § 2175(b)(3) (plumbing).
 
 ¶ 18. By authorizing the commissioner of labor and industry to set
 inspection and enforcement priorities and enabling the Department to
 exercise one or more of several enforcement options, the Legislature has
 vested a great deal of discretion in the Department in performing the
 duties addressed in plaintiffs' complaint. Thus, the duties plaintiffs
 seek to enforce are not ministerial, and mandamus can lie against the
 Department only under the "arbitrary abuse of power" exception. See Roy,
 128 Vt. at 34, 258 A.2d at 801-02 (distinguishing discretionary duties from
 ministerial acts). To determine whether plaintiffs' claim fits within this
 exception, we must determine whether the facts they allege and the
 reasonable inferences from those facts establish that the Department's
 conduct was so arbitrary that it amounted a refusal to act or a failure to
 perform a legal duty, and that plaintiffs have no other adequate remedy. 
 Id., 258 A.2d at 802.

 ¶ 19. We agree with plaintiffs that they have no alternative remedy. 
 "In order to supersede mandamus, the other remedy must be competent to
 afford relief on the very subject matter in question, and be equally
 convenient, beneficial and effective." Id. at 37, 258 A.2d at 803. The
 Department argues that plaintiffs have a remedy under 21 V.S.A. § 209,
 which allows for appeals to the superior court from actions or orders of
 the Commissioner of Labor and Industry, but this statute, by its plain
 language, applies only to actions and orders, not to failures to act. 21
 V.S.A. § 209 ("[A] person aggrieved by an order or action of the
 commissioner . . . may appeal to the superior court for the order or action
 within 20 days after the order is issued or the action is taken.")
 (emphasis added). Rule 75 is a better avenue for challenging a failure to
 act, and the Department has identified no alternative remedy. See V.R.C.P.
 75 (allowing review of "[a]ny action or failure or refusal to act by an
 agency of the state or a political subdivision thereof") (emphasis added). 

 ¶ 20. The key question is thus whether the Department's alleged
 failures to act were sufficiently arbitrary that they can be characterized
 as nonperformance of a legal duty. We acknowledge that it is difficult to
 articulate a clear answer to this question. In the context of a motion to
 dismiss, though, we need to consider only two broad preliminary questions
 to determine whether plaintiffs' complaint is sufficient to survive
 dismissal and allow further factual development: (1) whether there is some
 minimum standard of conduct with which the Department must comply; and (2)
 whether plaintiffs' complaint alleges that the Department has failed to
 comply with that standard.
 
 ¶ 21. Plaintiffs contend that, while the Department has discretion
 in how it enforces the housing code, the Department's actions represent a
 wholesale failure to enforce the code. The Department responds by arguing
 that it does not owe plaintiffs a legal duty of any kind, including a duty
 to enforce the housing code. The Department appears to base this argument
 on the fact that it does not owe plaintiffs a duty of care in tort. See,
 e.g., Corbin v. Buchanan, 163 Vt. 141, 144, 657 A.2d 170, 172 (1994)
 (holding that agency could not be held liable for damages resulting from
 allegedly negligent fire safety inspections). The type of duty plaintiffs
 must assert to fit within the exception to the requirements of mandamus is
 distinct from a duty of care. The proposition that the law imposes duties
 on an administrative agency is not related to the proposition that the
 agency must take care to prevent harm to the public or risk liability for
 negligence. In Roy, for instance, we held mandamus to lie against a local
 board for its failure to correct a previously identified violation of the
 health code. 128 Vt. at 36, 258 A.2d at 803. There, the duty imposed by
 law on the board was not a duty that the plaintiff could enforce in tort if
 he fell ill as a result of the violation. Instead, it was a more general
 duty to obey and enforce a mandatory statutory provision. Id. Thus, the
 fact that the Department does not owe plaintiffs a duty of care does not
 resolve the question of whether the Department may have other affirmative
 legal duties. 

 ¶ 22. We agree with plaintiffs that the Department has, at minimum,
 a legal duty to enforce the housing code, and that a wholesale failure to
 enforce the code would violate that duty. This is a somewhat simplistic
 and misleading description of the Department's alleged conduct, however. 
 Such a description cannot be reconciled with the fact that, for instance,
 the Department inspected the building at 13 High Street several times and
 identified multiple violations of the code, nor with the fact that the
 Department ultimately ordered the building closed and its utility service
 terminated. A more accurate description of the alleged conduct is that the
 Department enforced the housing code as a regime of voluntary compliance. 
 The specific omissions identified by plaintiffs are the Department's
 repeated failures to issue administrative fines or refer violations of the
 housing code and specific Department orders to the state's attorney for
 civil prosecution. In other words, the Department failed to take any
 action to ensure compliance with the provisions of the housing code or its
 own specific orders.
 
 ¶ 23. We conclude that the Department's use of a voluntary
 enforcement scheme can be characterized as a failure to perform a legal
 duty. Although there can be no expectation that the Department's limited
 resources will allow it to correct every code violation, a voluntary
 compliance regime is entirely inconsistent with the statutory framework of
 the housing code. The fire code phrases the duties of landlords in
 mandatory terms, explicitly requiring compliance with the Department's fire
 safety rules. See 21 V.S.A. § 251(b)-(c) (stating that "[a] person shall
 not maintain, keep or operate any premises or any part thereof . . . in a
 manner which causes or is likely to cause harm to other persons or property
 in case of fire" and that "[o]n premises under his control, a person shall
 observe rules promulgated under this subchapter for the prevention of fires
 which may cause harm to other persons or property"). While the electrical
 and plumbing codes lack similarly explicit language, they imply much the
 same thing by authorizing penalties for violations of the Department's
 rules and orders. Supra, ¶ 16. The Legislature could have enacted the
 housing code as a system of voluntary compliance, where the Department's
 only duties would have been to inform landlords of their deviations from
 sound safety practices, and to step in as a last resort to prevent imminent
 threats to the community. Instead, it created a system composed of
 mandatory provisions, and it assigned responsibility for enforcing those
 provisions to the Department.
 
 ¶ 24. Plaintiffs contend that the Department has subverted this
 mandatory statutory scheme by following a general policy that violations of
 the housing code will not result in sanctions against landlords. According
 to the complaint, the long history of violations at 13 High Street resulted
 in only the following pattern of action and inaction by the Department: (1)
 the Department inspected the building and identified serious violations;
 (2) the Department informed the landlord of the results of the inspection;
 (3) the Department issued a specific deadline for correction of the
 violations identified by the inspection report; (4) the landlord failed to
 take any corrective action; and (5) the Department took no further action
 until the next time it inspected and identified the same or similar
 violations. After several years of repeating this cycle, the violations
 became severe enough that the Department threatened to close the building
 if Mr. Komasa failed to complete the ordered repairs. When Mr. Komasa did
 not respond, the Department ordered the building closed, but took no
 additional enforcement action against Mr. Komasa. 

 ¶ 25. While the Department correctly points out that the housing
 code did not require the Department to take a specific enforcement action,
 such as issuing an administrative fine or referring the matter to the
 state's attorney for civil prosecution, the pattern of violations
 plaintiffs have identified required some response beyond issuing yet
 another order requesting compliance. Instead, obeying the housing code,
 and even obeying direct orders of the Department, became an entirely
 voluntary obligation on the part of Mr. Komasa and his predecessors. The
 incentives created by the Department's alleged enforcement scheme were for
 the building's landlords to ignore the housing code and the Department's
 occasional inspections and orders, to avoid spending any additional money
 on a deteriorating building, and to allow the building to grow
 progressively less safe, until it finally became uninhabitable. The
 housing code became a mandatory obligation only when the building was
 deemed imminently hazardous. At that point, it may well have been in Mr.
 Komasa's best interest to have the tenants of 13 High Street removed,
 allowing him to renovate and find new tenants, presumably at a higher rent. 
 
 ¶ 26. The Department's alleged enforcement regime appears
 inherently ineffective with respect to ensuring anything but the minimum
 level of housing code compliance necessary to avoid imminent hazards;
 everything else is left to the discretion of the landlord. The only
 meaningful role the Department plays in protection against run-of-the-mill
 violations is to inform the landlord of their existence. A landlord who is
 confident that a building can be maintained at a minimally habitable level,
 or who is indifferent to the loss of already-diminishing rental income from
 a deteriorating building, may ignore the housing code with impunity. 
 Rental housing under such an enforcement regime cannot be expected to be
 any safer or healthier than it would be without any housing code at all. 
 If that is the system the Department has implemented, it represents an
 arbitrary abuse of power that amounts to a failure to comply with its legal
 duties. As plaintiffs' complaint is sufficient to allege that such a
 system is in place, it states a claim in the nature of mandamus under Rule
 75. We reverse and remand so that plaintiffs may attempt to prove their
 allegations.

 B.

 ¶ 27. We next address plaintiffs' claim that the Department's
 actions resulted in the loss of their leaseholds without due process or
 just compensation. We agree with the Department that the isolated act of
 ordering a building vacated cannot be characterized as an unconstitutional
 taking without just compensation, or as a taking without due process, when
 the order to vacate is necessary to eliminate an imminent threat of harm. 
 We nevertheless hold that dismissal on these grounds was premature with
 respect to plaintiffs' takings claims. While plaintiffs' complaint does
 not state a due process claim, the facts alleged were sufficient to raise
 the question of whether the Department's alleged failures to act led to the
 destruction of plaintiffs' leaseholds without compensation. 

 ¶ 28. We first address plaintiffs' claim that the Department failed
 to provide them with due process, in the form of notice and a hearing,
 prior to ordering that they vacate their homes. The Fourteenth Amendment
 to the United States Constitution provides that no state shall "deprive any
 person of life, liberty, or property without due process of law." U.S.
 Const. amend. XIV. The United States Supreme Court has interpreted this
 Due Process Clause to require notice and a predeprivation hearing before a
 person's property is taken. Fuentes v. Shevin, 407 U.S. 67 (1972). This
 requirement does not apply, however, in "extraordinary situations where
 some valid governmental interest is at stake that justifies postponing the
 hearing until after [deprivation]." Id. at 82 (quotations omitted). 
 "Protecting citizens from an immediate risk of serious bodily harm falls
 squarely within those 'extraordinary situations' contemplated in Fuentes." 
 Flatford v. City of Monroe, 17 F.3d 162, 167 (6th Cir. 1994). 
 
 ¶ 29. We agree with the Department that the closure of the building
 at 13 High Street and the termination of utility service at the other
 buildings were justified by an immediate risk of serious bodily harm. 
 "[W]here the need to protect lives is the basis for [the challenged
 deprivation], government officials should not be made to hesitate in
 performing their duties, particularly where postdeprivation remedies can
 immediately correct any errors in judgment." Id. at 168. While there
 might be circumstances under which the Department's findings of code
 violations would be insufficient to establish the exigency necessary for
 action without a prior hearing, plaintiffs' allegations do not establish
 such circumstances. Each of the Department's orders to vacate or cut off
 utility service was supported by findings of dangerous code violations, and
 plaintiffs' complaint concedes the existence, and in most cases, the
 seriousness, of these violations. Indeed, much of the complaint is devoted
 to establishing that the longstanding violations were serious enough to
 merit Department action prior to the orders to vacate. No further factual
 development is necessary to determine that the violations at issue posed
 enough of a threat to merit ordering plaintiffs to vacate their homes, and
 it was, therefore, appropriate for the court to dismiss plaintiffs' due
 process claims. 
 
 ¶ 30. It was not appropriate, however, for the court to dismiss
 plaintiffs' takings claims. Both the Vermont and federal constitutions
 prohibit takings of private property for public purposes without
 compensation. U.S. Const. amend. V ("[N]or shall private property be taken
 for public use, without just compensation."); Vt. Const. ch. I, art. 2
 ("That private property ought to be subservient to public uses when
 necessity requires it, nevertheless, whenever any person's property is
 taken for the use of the public, the owner ought to receive an equivalent
 in money."). This prohibition applies not only when the government takes
 property for its own use through the formal procedures of eminent domain,
 but also when government regulation results in the loss of a property
 interest. Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1015
 (1992). The property interest lost need not be an ownership interest; a
 leasehold is an interest in property subject to analysis under the takings
 clause. Alamo Land & Cattle Co. v. Arizona, 424 U.S. 295, 303 (1976); see
 also Devines v. Maier, 728 F.2d 876, 880 (7th Cir. 1984) (holding that a
 residential leasehold is a property interest compensable under the takings
 clause). Moreover, the loss need not be permanent; a temporary taking of
 property can be compensable. First English Evangelical Lutheran Church of
 Glendale v. County of Los Angeles, 482 U.S. 304, 318 (1987).

 ¶ 31. The prohibition on takings without compensation is not
 absolute. We have previously held that an exercise of the police power to
 abate a public nuisance, and specifically, to abate a fire hazard, is not a
 compensable taking. Eno v. City of Burlington, 125 Vt. 8, 13, 209 A.2d
 499, 504 (1965) ("A fire hazard is a nuisance and the abatement of such a
 nuisance is not the taking of property without due process or a taking for
 which compensation must be made."). While takings jurisprudence,
 especially at the federal level, has undergone significant development
 since our holding in Eno, there remains no question that the abatement of a
 nuisance is not a taking. " '[T]akings' jurisprudence . . . has
 traditionally been guided by the understandings of our citizens regarding
 the content of, and the State's power over, the 'bundle of rights' that
 they acquire when they obtain title to property." Lucas, 505 U.S. at 1027. 
 Thus, where, as here, "the State seeks to sustain regulation that deprives
 land of all economically beneficial use," it may refuse to compensate a
 property owner only if the regulation prohibits a use of the land that was
 "not part of his title to begin with." Id. When the challenged state
 action is consistent with "background principles of the State's law of
 property and nuisance," no property interest has been taken, and no just
 compensation is due. Id. at 1029. 
 
 ¶ 32. Although plaintiffs bear no responsibility for creating the
 nuisance the Department attempted to abate through its orders, remaining in
 a building that posed a threat to public safety was not among the "bundle
 of rights" reserved to them as tenants. Vermont law allows a tenant to
 remain in a dwelling after a landlord's violation of the warranty of
 habitability. See 9 V.S.A. § 4458(a) (providing that a tenant "may . . .
 terminate the rental agreement on reasonable notice" if the landlord fails
 to comply with habitability requirements, as one of several alternatives
 under such circumstances). This does not mean, however, that tenants are
 entitled to remain in a building when doing so threatens the surrounding
 community, as in cases where occupancy of the building poses a fire hazard. 
 Accordingly, to the extent plaintiffs' claims challenge the Department's
 ultimate decision to order that their homes be vacated or their utility
 service be terminated, their allegations do not state valid takings claims. 

 ¶ 33. It would be unfair, however, to construe plaintiffs' claims so
 narrowly. Instead, we understand plaintiffs to challenge the Department's
 entire course of action with respect to the dwellings at issue. Like
 plaintiffs' claims under Rule 75, their takings claims rest on their
 allegations that the Department failed to carry out its enforcement duties. 
 In this sense, the government action that resulted in the destruction of
 plaintiffs' property interests was the Department's alleged policy of
 enforcing the housing code only as a last resort in cases of imminent harm. 
 This approach to takings analysis is entirely consistent with Eno, as
 plaintiffs do not seek compensation for the Department's abatement of a
 nuisance. Instead, they seek compensation for the Department's role in
 allowing the nuisance to continue unabated for so long. At the time
 plaintiffs were forced to vacate their homes, each plaintiff possessed only
 the illusory right to remain in an imminently hazardous dwelling. At the
 time plaintiffs allege the Department should have acted, though, each had a
 valid property right to occupy her home. 
 
 ¶ 34. We recognize that plaintiffs' takings claims are unusual, but
 that is not a sufficient reason to allow their dismissal without full
 factual development. See Sprague, 145 Vt. at 447, 494 A.2d at 125 (stating
 that claims should not be dismissed simply because they are novel or
 extreme). We need only ascertain that plaintiffs' complaint corresponds to
 general takings principles, and we conclude that it does. The complaint
 alleges that the Department's choice to enforce the housing code only as a
 last resort deprived them of all beneficial use of their homes. See Lucas,
 505 U.S. at 1015 (stating that just compensation is categorically
 appropriate "where regulation denies all economically beneficial or
 productive use of land"). The complaint also contains sufficient
 allegations to remove plaintiffs' claims from the exception that the
 government need not compensate for enforcing pre-existing background
 principles of nuisance. Id. at 1029. The government's ability to avoid
 paying compensation when it abates a nuisance, such as an imminent fire
 hazard, is conditioned on its lack of responsibility for the exigency. See
 Devines, 728 F.2d at 884 (allowing the state to condemn uninhabitable
 residential apartments without compensating the tenants when "the
 uninhabitability of the leasehold interest . . . occurs through no fault of
 the State"). 

 ¶ 35. Plaintiffs and the Department agree that the landlords of the
 buildings at issue were primarily responsible for the buildings' condition,
 but plaintiffs contend that the Department shares that responsibility. 
 They allege that the Department knew of the relevant code violations, and
 that in the face of the landlords' refusal to take corrective action, it
 chose to allow the violations to continue until they became serious enough
 to require removal of the tenants or termination of utility service. But
 for the Department's failure to act, there would have been no nuisance to
 abate, and plaintiffs' property would not have been taken. (FN6) If
 plaintiffs can prove these allegations, they will be entitled to just
 compensation. Their complaint thus states valid takings claims, and the
 superior court's dismissal of these claims was premature. 

 II.
 
 ¶ 36. As a final matter, we affirm the superior court's denial of
 class certification. Provided that the superior court has applied the
 correct legal standards, we review the court's decision on a motion for
 class certification for abuse of discretion. Caridad v. Metro-North
 Commuter RR., 191 F.3d 283, 291 (2d Cir. 1999). Here, plaintiffs contend
 that the court erred in applying the law, so our review is de novo. Miller
 v. Miller, 2005 VT 89, ¶ 10, 178 Vt. 273, 882 A.2d 1196. Motions for class
 certification are controlled by Rule 23, which is substantively identical
 to Federal Rule 23. Reporter's Notes, V.R.C.P. 23. To be certified, a
 class must satisfy the four requirements of Rule 23(a), which are commonly
 referred to as numerosity, commonality, typicality, and adequacy of
 representation. (FN7) E.g., Amchem Prods., Inc. v. Windsor, 521 U.S. 591,
 613 (1997). Rule 23(b) contains additional prerequisites, but the superior
 court did not consider whether a class action would be appropriate under
 Rule 23(b), as it determined that the class failed to satisfy the
 requirements of Rule 23(a).

 ¶ 37. Plaintiffs moved for certification of a class containing "all
 residents of rental housing in Vermont where there are one or more
 violations of the statutes and rules pertaining to habitability and
 enforced by [the Department]," including "all people who now reside in such
 housing, all people who have resided in such housing since November 13,
 1999, and all people who will reside in such housing in the future." In
 addition, plaintiffs sought to certify a subclass "of all Vermont
 residential tenants who have in the past three years, or will in the
 future, be forced to move out of their homes as a result of [the
 Department's] actions and omissions regarding code enforcement in rental
 housing." 
 
 ¶ 38. The superior court determined that the proposed class was
 overbroad, and thus, that "it would not be administratively feasible for
 the Court to determine if a particular individual is a member of the
 proposed class." See 7A C. Wright, A. Miller & M. Kane, Federal Practice
 and Procedure § 1760, at 136, 140 (stating that although a class need not
 be "so ascertainable that every potential member can be identified at the
 commencement of the action," it must be "sufficiently definite so that it
 is administratively feasible for the court to determine whether a
 particular individual is a member"). Furthermore, the court decided
 against plaintiffs on class certification because a class cannot "be
 defined so broadly that it encompasses individuals who have little
 connection with the claim being litigated," nor can the class definition be
 too "amorphous." Id. at 142-44. 

 ¶ 39. Our analysis of the proposed class definition leads us to the
 same conclusion as the superior court. The class included virtually every
 renter and leasehold in the state of Vermont over which the Department has
 jurisdiction and where there may have been a code violation. It was
 entirely fair for the superior court to hold that the class was too
 amorphous as so defined. We acknowledge that the trial court could have
 required a narrower definition of the class that was more in line with the
 allegations in the complaint, and that it did not do so. In re New York
 City Mun. Sec. Litig., 87 F.R.D. 572, 580 (S.D.N.Y. 1980). ("Prior to
 decision on the merits, leave to amend the complaint to redefine the class
 should be freely given [by the trial court]."). There was no real effort
 to force redefinition because the trial court dismissed the action for
 failure to state a claim. 

 ¶ 40. On remand, however, a trial court has discretion to change a
 decision not to certify a class, even where an appellate court has affirmed
 the trial court's earlier denial of class certification. Salazar-Calderon
 v. Presidio Valley Farmers Ass'n, 765 F.2d 1334, 1350 (5th Cir. 1985). 
 Under Rule 23(c)(1), the superior court has continuing power to adjust its
 class decisions in light of evidentiary developments and the general
 progression of the case from assertion to facts. Richardson v. Byrd, 709
 F.2d 1016, 1019 (5th Cir. 1983). In view of the early stage of this
 litigation, and our reversal of the trial court on the motion to dismiss,
 plaintiffs are not barred from seeking certification of a more precisely
 defined class that meets the standards of Rule 23.
 
 ¶ 41. We add, as guidance on remand, that plaintiffs must establish
 a sufficient connection between any proposed class of renters and the
 Department for a class action to stand. At the same time, we caution the
 trial court that in the event that plaintiffs move to certify a new class
 on remand, the certification decision must be made wholly apart from a
 consideration of the merits of the case using the standards set out under
 Rule 23(a) & (b). 

 Affirmed in part, reversed in part, and remanded for further
 proceedings consistent with the views expressed herein. 



 FOR THE COURT:



 _______________________________________
 Associate Justice


------------------------------------------------------------------------------
 Dissenting


 ¶ 42. BURGESS, J., concurring in part and dissenting in part. 
 Rather than call on the courts to run the Department of Labor and Industry,
 a task we are neither qualified nor authorized to do, plaintiffs should
 address their complaint to the executive branch responsible for setting
 code enforcement priorities, and to the legislative branch that granted the
 Department its broad discretionary authority over the priority and method
 of housing code enforcement. Contrary to the tenor of the complaint and
 the majority opinion, the applicable statutes impose no requirement on the
 Department to use its enforcement tools in any particular sequence, to any
 prescribed degree, or in any manner more satisfactory to plaintiffs. 
 Therefore, I would affirm the trial court's dismissal of plaintiffs'
 complaint for failing to state a viable cause of action.

 ¶ 43. Regarding plaintiffs' due process claim, the legislation cited
 in the complaint imposes neither an actionable duty issuing from the
 Department to these plaintiffs in particular, nor any procedural conditions
 on the Department before it responds to imminent hazards. As acknowledged
 by the majority, the Department may respond to emergencies with emergency
 measures, without a prior hearing, and properly did so in the case of the
 plaintiffs living at 13 High Street. Thus, I concur with the majority's
 decision to affirm dismissal of the plaintiffs' due process claims as
 unfounded.
 
 ¶ 44. As for plaintiffs' request for class certification, the
 named plaintiffs appear to have little in common with the amorphous and
 varied class that they purport to represent. The original plaintiffs at 13
 High Street had to vacate after a long history of inspections reiterated
 code violations that ultimately threatened an immediate risk of bodily
 harm. Intervening plaintiff Neville alleges being misled by her landlady
 to move back into a residence previously condemned, and not approved for
 reoccupancy, by the Department. The code violations described by
 intervening plaintiff Limoge were imminently hazardous, but her inspection
 experience-three inspections in three days-was quite different from that of
 the other plaintiffs. Thus, on the pleadings, the situations of the named
 plaintiffs are dissimilar, and they have little resemblance to the broad
 class they claim to represent: "all . . . tenants," three years past and in
 the future, who "live in housing where there exists one or more violations
 of the codes," regardless of the severity of the violation.

 ¶ 45. The class, as pleaded, fails to satisfy the "[p]rerequisites
 to a class action" set out under V.R.C.P. 23(a). Questions of law and fact
 must be common to the class, id. at 23(a)(2), and claims of the named
 plaintiffs based on acts or omissions of the Department must be typical of
 the claims of the class. Id. at 23(a)(3). The complaint fails to allege
 what law, facts and claims are common and typical between tenants forced
 out of their homes due to immediate danger of fire or electrocution, and
 plaintiffs' proposed class of tenants faced with single, or even multiple,
 minor code violations such as nonworking electrical outlets, absent
 bannisters or missing junction box covers. If the putative class alleged
 by plaintiffs "is so numerous that joinder of all members is
 impracticable," as required by V.R.C.P. 23(a)(1), it is only because the
 class is overbroad as pleaded. Accordingly, I concur with the majority's
 decision to affirm the trial court's denial of class certification.
 
 ¶ 46. I would, however, also affirm the trial court's dismissal of
 plaintiffs' mandamus and takings claims. Plaintiffs seek to mandate the
 Department of Labor and Industry to enforce the housing codes against
 landlords in a manner satisfactory to the tenants, and, under a tortured
 theory of unconstitutional governmental taking, look to the Department to
 pay tenants for closing dangerous rental units. Plaintiffs' frustration is
 understandable in that they are relatively powerless and stuck between the
 Department's code enforcement and their landlords' recalcitrance. 
 Nevertheless, their complaint alleges only that the Department is enforcing
 the housing code in a manner disagreeable to them, rather than contrary to
 statute. Notwithstanding the majority's inaccurate characterization of the
 Department's enforcement program as one of "voluntary compliance," the
 allegations in the complaint describe enforcement decisions and mechanisms
 falling well within the choices authorized by the Department's enabling
 legislation.

 ¶ 47. The enforcement program described by plaintiffs could just as
 easily be characterized as "comply or close," rather than "voluntary
 compliance," and the majority agrees that the orders to vacate in this case
 were justified by the emergency situations presented. Ante, ¶ 29. Because
 the complaint fails to set forth an "arbitrary abuse of power" by the
 Department sufficient to support the mandamus action, Roy v. Farr, 128 Vt.
 30, 34, 258 A.2d 799, 802 (1969), and further fails to allege any
 unconstitutional taking recognized in law, both claims were properly
 dismissed. Accordingly, I respectfully dissent from the remand for further
 litigation.

 ¶ 48. Given the undisputed facts of the Department's enforcement
 efforts as pleaded by plaintiffs, even the majority is compelled to
 describe as "somewhat simplistic and misleading" plaintiffs' claim that the
 Department's actions amounted to a wholesale failure to enforce the code 
 Ante, ¶ 22. Plaintiffs' own allegations demonstrate that the Department
 made frequent inspections of the subject properties, found violations,
 issued orders compelling the landlords to rectify the violations, required
 the landlords to prepare a plan of corrective action, threatened various
 actions if the landlords did not comply, and eventually closed hazardous
 buildings or terminated dangerous utility services when the landlords
 failed to comply.

 ¶ 49. The majority moves to revive the complaint, however, by
 reconstructing what, in the majority's view, plaintiffs really meant to
 say-that the Department's methods of enforcing the housing code amounted to
 "a regime of voluntary compliance" in which there was no effort to coerce
 correction of violations. (FN8) The reason that plaintiffs do not actually
 make such a claim might be because several of their own allegations are
 expressly contrary to the majority's characterization of their claim. 
 Indeed, it is precisely the Department's enforcement of the fire and
 electrical safety statutes, rather than toleration of imminent hazards,
 that prompted plaintiffs' complaint. The complaint describes a system of
 inspections combined with closure orders that fall squarely within the
 Department's discretion as authorized by law. The alleged facts show that
 the Department inspected, found violations, ordered compliance, threatened
 consequences for noncompliance, and then followed through on the
 consequences. What plaintiffs seek is increased intermediate enforcement
 efforts emphasizing litigation to assess monetary and judicial sanctions
 against landlords, but the statutes impose no duty on the Department to
 enforce the code as preferred by plaintiffs. Nor do plaintiffs allege that
 their remedy of mandated fines, penalties, and injunctions would actually
 be more effective-and not result in earlier closures and more tenant
 dislocation-than the policy alleged to be in place.
 
 ¶ 50. In any event, the enforcement actions that plaintiffs
 complain about here are explicitly discretionary and not subject to
 mandamus. As the majority acknowledges, mandamus is ordinarily limited to
 compelling "merely ministerial" acts of public officials. Roy, 128 Vt. at
 34, 258 A.2d at 801. Mandamus "does not issue to compel action that is
 discretionary," Richardson v. City of Rutland, 164 Vt. 422, 424, 671 A.2d
 1245, 1247 (1995) (quoting Dobbs, Remedies § 2.10, at 112 (1973)(internal
 quotations omitted), except " '[w]here there appears, in some form, an
 arbitrary abuse of the power vested by law in the administrative officer .
 . . which amounts to a virtual refusal to act or to perform a duty imposed
 by the law.' " Id. (quoting Couture v. Selectmen of Berkshire, 121 Vt. 359,
 361, 159 A.2d 78, 80 (1960)); see Vt. State Employees' Ass'n v. Criminal
 Justice Training Council, 167 Vt. 191, 195, 704 A.2d 769, 771 (1997)
 (explaining that writ of mandamus may be extended, in the absence of any
 other adequate legal remedy, only "to reach extreme abuses of discretion
 involving refusals to act or perform duties imposed by law").

 ¶ 51. In this case, as the majority acknowledges, the fire,
 electrical, and plumbing safety statutes all commit inspection and
 enforcement priorities to the discretion of the commissioner of labor and
 industry. Ante, ¶ 16. Each safety scheme authorizes, but does not
 require, the Department to respond to violations in various ways, including
 issuing orders to building owners to correct violations, 21 V.S.A. § 253(a)
 (fire); 26 V.S.A. § 895 (electrical); 26 V.S.A. § 2175(b)(1) (plumbing),
 and to impose a variety of sanctions if the violations are not corrected. 
 See 21 V.S.A. § 253(a) (commissioner "may" close building if fire code
 violation is not corrected); 26 V.S.A. § 895 (commissioner "may" disconnect
 electrical service if code violation is not corrected); 26 V.S.A. §
 2175(b)(3) (commissioner "may" disconnect water or sewer service if
 plumbing code violation is not corrected) (emphases added). The statutes
 also authorize, but do not require, the Department to seek civil and
 administrative fines and injunctions for violations. Ante, ¶ 17. Further,
 as in the instant case, if the commissioner deems a fire code violation to
 be imminently hazardous, the commissioner "shall" order the violation
 corrected immediately and, if it is not corrected, "may" order the premises
 immediately closed until the violation is corrected. 21 V.S.A. §253(a)
 (emphasis added).
 
 ¶ 52. The majority's recognition of a mandamus action based on the
 allegations in plaintiffs' complaint is wholly unsupported and, in fact,
 contradicted by the pleadings. The majority acknowledges that the statutes
 vest within the Department "a great deal" of enforcement discretion, ante,
 ¶ 18, and then recites the plaintiffs' allegations that the Department
 inspected buildings, ordered correction of violations, and later ordered
 the closing of imminently hazardous premises for noncompliance. Yet,
 notwithstanding its acknowledgment of the Department's enforcement actions,
 the majority stretches to allow the mandamus claim by declaring that the
 Department's inspections and orders to close and vacate dangerous premises
 in the face of uncorrected violations "could be characterized as a failure
 to perform a legal duty," because the Department did not exercise the other
 enforcement options available under the statutes. Ante, ¶ 23. The
 majority first imagines that litigation to secure fines, penalties and
 injunctions would necessarily accomplish better code compliance than
 closing dangerous buildings, and then concludes that an enforcement regime
 limited to inspection and closure of dangerous buildings is subject to
 mandamus as an "arbitrary abuse of power" because such a program leaves
 rental housing no "safer or healthier than it would be without any housing
 code at all." Ante, ¶ 26. 

 ¶ 53. This is a fallacy for at least three reasons. First, the
 inspection and closure of dangerous housing for uncorrected code violations
 obviously removes unsafe housing from the rental market, which is, at
 worst, still a better result than having no housing code at all. Second,
 nothing in the pleadings support an implication that scofflaw landlords
 would respond more compliantly to a system of monetary penalties and
 injunctions, or that such sanctions are otherwise inherently more
 compelling, than the Department's "comply or close" enforcement program
 described by plaintiffs. Third, and most importantly, it cannot be an
 abuse of discretion for the Department to exercise the discretion expressly
 granted by the Legislature to set priorities and elect, from several
 express options, how to enforce the housing code.
 
 ¶ 54. That plaintiffs or this Court might exercise enforcement
 discretion differently does not mean that the Department's enforcement
 decisions are an abuse of discretion. Plaintiffs cannot, with a straight
 face, seek to enjoin the Department's enforcement of the housing code on
 the one hand, and on the other hand complain that there is no enforcement. 
 "Mandamus will not lie for the review of acts that involve the exercise of
 judgement and discretion." Richardson, 164 Vt. at 424, 671 A.2d at 1247. 
 Plaintiffs' mandamus complaint fails to allege the necessary "abuse of
 power" amounting to a refusal by the Department, virtual or otherwise, to
 enforce the housing codes as authorized by the statutes. Id. Hence, the
 trial court properly dismissed the complaint.

 ¶ 55. Plaintiffs fare no better on their takings claim. As the
 majority recognizes, plaintiffs have no valid takings claim based on the
 Department's decision to close their buildings or to terminate their
 utility services due to an imminent hazard. Plaintiffs complain that the
 Department's condemnation of a dangerous building amounted to a taking of
 their leasehold, but the law is settled that governmental abatement of a
 fire hazard is not a compensable taking. Eno v. City of Burlington, 125
 Vt. 8, 13, 209 A.2d 499, 504 (1965). Nevertheless, the majority again
 seeks to resurrect plaintiffs' complaint by recasting its takings claims as
 a claim for compensation based on the Department allowing a nuisance to
 persist unabated after ongoing inspections. The majority reasons that the
 government can be financially liable for the loss of the leaseholds if,
 "but for the Department's failure to act, there would have been no nuisance
 to abate," and so no need to condemn the residences. Ante, ¶¶ 34-35. 
 Under this logic, the police become liable for the acts of the criminals.

 ¶ 56. The majority's theory first depends on the viability of
 plaintiffs' inconsistent claim that the Department refused or failed to act
 by inspecting and condemning the rental units. The underlying mandamus
 claim is untenable, and the takings claim must fail for the same reason.
 Plaintiffs' pleadings admit that the Department did take action, although
 not the action prescribed by plaintiffs, and the majority agrees that the
 actions taken were authorized by the statutes. 
 
 ¶ 57. The majority erroneously "ascertain[s] that plaintiffs'
 complaint corresponds to general takings principles." Ante, ¶ 34. 
 General principles of takings law are neatly summarized in Chapter I,
 Article 2 of the Vermont Constitution: "[W]henever any person's property is
 taken for the use of the public, the owner ought to receive an equivalent
 in money." Excluding police intervention, compensable takings normally
 require a governmental interference with private property, "and exclusion
 of the owner from its beneficial use." See Griswold v. Town Sch. Dist. of
 Weathersfield, 117 Vt. 224, 226, 88 A.2d 829, 831 (1952). The
 deterioration of a tenant's use and enjoyment of a leasehold imagined by
 the majority as resulting from the Department's decision not to seek
 monetary penalties and injunctions does not correspond to general takings
 principles. Such a decision by the Department interferes with no property
 interest. There is no public use. Short of a closure order responding to
 an imminent hazard which the majority agrees is not a taking, tenants are
 not to be excluded from their leaseholds. Plaintiffs' takings claim is not
 merely "novel or extreme," as the majority suggests, ante, ¶ 34, but is
 unrecognizable and nonexistent in law.

 ¶ 58. This really appears to be a damages claim for alleged
 Department nonfeasance masquerading as a takings claim. The majority
 recognizes as much when it confirms that plaintiffs "seek compensation for
 the Department's role in allowing the nuisance to continue unabated for so
 long." Ante, ¶ 33. The legal and practical effect of the majority
 extending inverse takings claims to allege inaction by government agencies
 is troubling. All victims of loss arising from regulatory or criminal
 violations by third parties could claim compensation upon a mere allegation
 that "but for" a lack of action by the enforcement authority, the offender
 could not have succeeded. (FN9) Such a claim could arise whenever a
 regulatory agency head, prosecuting authority, or police chief charged with
 the general duty of enforcing the law determined to prioritize enforcement
 efforts in one area at the necessary expense of another. Even if no
 liability ultimately obtained, what resources would be diverted to
 pre-trial discovery and litigation of such causes of action? Since total
 deprivation of a leasehold due to condemnation cannot be a taking, Eno, 125
 Vt. at 13, 209 A.2d at 504, how can an agency's alleged inaction leading to
 condemnation, but resulting in less than a taking, be compensable as a
 taking? The cause of action invented by the majority is unworkable.

 ¶ 59. I would affirm the trial court's dismissal of the takings
 claim, as well as the underlying mandamus claim upon which it is based. I
 am authorized to say that Chief Justice Reiber joins in the dissent.



 _______________________________________
 Associate Justice



------------------------------------------------------------------------------
 Footnotes


FN1. Plaintiffs and the Department refer to the housing statutes and
 regulations that the Department administers collectively as the "housing
 code," "habitability statutes and rules," or "building safety regulations." 
 For the sake of simplicity, we will use the term "housing code" to describe
 these statutes and regulations.

FN2. Of the named plaintiffs listed in the third amended complaint, we note
 that only plaintiffs Bean, Neville, and Limoge raise individual claims of
 takings without just compensation. We continue to refer to these
 plaintiffs as "plaintiffs" to avoid confusion.

FN3. Our disagreement with the dissent appears to be over the breadth of the
 standard of review in this case. Our standard of review of 12(b)(6) motions
 is long-standing and generous to the nonmovant, and thus, we read
 plaintiffs' complaint broadly-recognizing that their allegations are novel. 
 The dissent, on the other hand, appears to read the complaint narrowly and,
 as such, forecloses the possibility of further evidentiary development at
 the trial court level in contravention of the standard, which disfavors
 dismissal by 12(b)(6) motion.

FN4. Pursuant to 2003, No. 141 (Adj. Sess.), fire safety jurisdiction was
 transferred to the Department of Public Safety, and the relevant provisions
 in Title 21 were transferred to Title 20, §§ 2728-2739. For the purposes
 of this opinion, we refer to the provisions in place at the time of
 plaintiffs' original complaint.

FN5. We reject the Department's argument that the statute vests civil
 prosecutorial discretion solely in the state's attorney. The housing code
 contemplates that the Commissioner of Labor and Industry will refer some
 set of violations to the state's attorney for prosecution. For instance,
 the fire code provides that "[t]he state's attorney of the county in which
 [a] violation occurs shall prosecute such violation and may commence a
 proceeding in the superior court." 21 V.S.A. § 254(a). While this
 language, in isolation, might seem to vest discretion solely in the state's
 attorney, § 254(c) provides, after authorizing the commissioner to assess
 administrative penalties, that "[a]n election by the commissioner to
 proceed under this subsection shall not limit or restrict the
 commissioner's authority under subsection (a) of this section," indicating
 that the commissioner is primarily responsible for initiating civil
 prosecution, presumably by referring violations to the appropriate state's
 attorney. (Emphasis added). 

FN6. The dissent mischaracterizes plaintiffs' takings claim when it posits
 that our decision would allow, "[a]ll victims of loss arising from
 regulatory or criminal violations by third parties [to] claim compensation
 upon a mere allegation of . . . a lack of action by the enforcement
 authority." Post, ¶ 58. Plaintiffs allege a complete failure of the
 Department to act as statutorily prescribed-affecting an entire class of
 persons-rather than a discretionary decision resulting in dissatisfaction
 or loss to one renter. At this point in the proceedings plaintiffs have
 merely made allegations (presenting novel mandamus and takings claims) that
 we are allowing to go forward; whether plaintiffs will ultimately be
 successful on the merits of their claims, we leave to the trial court upon
 full development of the facts.

FN7. The precise terms of Rule 23(a) require, in relevant part, that: 

 (1) the class is so numerous that joinder of all members is
 impracticable, (2) there are questions of law or fact common to
 the class, (3) the claims or defenses of the representative
 parties are typical of the claims or defense of the class, and (4)
 the representative parties will fairly and adequately protect the
 interests of the class.

FN8. The majority asserts that its reading of the complaint as such is
 simply a matter of broad reading encouraged by the standard of review
 under V.R.C.P. 12(b)(6). Ante, ¶ 12 n. 3. But even the broadest reading
 must still "consider . . . all of the nonmoving party's factual allegations
 as true." V.R.C.P. 12(b)(6). Here, plaintiffs' factual allegations were
 that the Department routinely exercises some statutorily authorized
 enforcement actions, although not others. My view that plaintiffs'
 dissatisfaction with the enforcement options actually pursued by the
 Department fails to support a claim of utter failure in enforcement is not
 a result of narrow reading, as the majority suggests, but rather is the
 product of treating plaintiffs' factual allegations as true.

FN9. The majority asserts that this mischaracterizes plaintiffs' takings
 claim, contending that plaintiffs allege a "complete failure of the
 Department to act as statutorily prescribed-affecting an entire class of
 persons." Ante, ¶ 35 n. 6. The majority is incorrect on several levels. 
 The statutes do not prescribe, in the mandatory sense, that the Department
 do anything plaintiffs insist upon. On the other hand, the Department's
 enforcement actions as alleged by plaintiffs were explicitly authorized by
 the statute. While plaintiffs employ the words "wholesale failure," this
 merely conclusory pleading is plainly contradicted by their factual
 allegations of enforcement as recited in the complaint and by the majority. 
 These named plaintiffs failed to effectively allege an "entire class"
 affected by the Department's enforcement actions. Intended or not, given
 that plaintiffs allege the Department took enforcement action and complain
 that its enforcement was unsatisfactory, the majority today recognizes a
 cause of action for compensation for imperfect law enforcement.