******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# LATONNA COLLIER ET AL. *v.* ADAR HARTFORD REALTY, LLC, ET AL.
## (SC 20797)

Robinson, C. J., and McDonald, Mullins, Ecker and Suarez, Js.

*Syllabus*

The plaintiffs, former residents of a federally subsidized housing complex that was owned and managed by the defendants, appealed from the trial court's denial of their motion for class certification. In their complaint, the plaintiffs alleged, among other causes of action, fraud, recklessness, negligence, breach of the warranty of habitability, and a violation of the Connecticut Unfair Trade Practices Act (42-110a et seq.) in connection with the defendants' alleged failure to maintain the housing complex in a safe and habitable condition and their pattern and practice of delaying inspections, concealing health and safety hazards, and violating federal, state, and local housing laws. The trial court denied the plaintiffs' motion for class certification on the ground that their proposed class, which consisted of all persons who resided at the housing complex between 2004 and 2019 who were adversely affected by the defendants' alleged practices, failed to satisfy the predominance and superiority requirements under the rule of practice (§ 9-8 (3)) governing class action certification. The trial court reasoned that the predominance requirement was not met because the determination of whether each unit in the housing complex was rendered uninhabitable was fact-specific and dependent on individualized factors and that the superiority requirement was not met due to the highly individualized proof required to establish liability. Although the trial court recognized that there could exist a basis for class certification with respect to certain of the plaintiffs' claims for some of the discrete events alleged in the complaint, such as a sewage backup in 2019 that resulted in the tenants' evacuation of the housing complex, the court concluded that the proposed class of all former tenants over a period of many years was too broad.

*Held* that the trial court did not abuse its discretion in denying the plaintiffs' motion for class certification, as the proposed class of plaintiffs was too broad, and the trial court had no obligation to consider redefining the scope of the class sua sponte:

In support of their claims, the plaintiffs primarily relied on evidence concerning the defendants' efforts, beginning in 2015, to delay inspections and to hide housing code violations, inspection reports from 2018 documenting the squalid living conditions at the housing complex, and evidence of the 2019 sewage backup, and, because there was an absence of evidence regarding the allegedly uninhabitable conditions at the housing complex prior to 2015 at the earliest, the vast majority of the proposed

class members would need to adduce individualized proof to establish the defendants' liability.

Accordingly, there was no evidentiary basis to support the conclusion that common questions of fact or law would be the object of most of the efforts of the litigants and the court, and the proposed class therefore was too broad and failed to satisfy the predominance requirement.

Moreover, this court concluded that the predominance inquiry substantially encompasses the superiority analysis and that, if the predominance requirement is not satisfied, a class action likely will not be the superior mechanism to resolve the dispute between the parties.

Furthermore, a trial court is vested with broad discretion to make class certification decisions, which includes the authority to limit or modify the scope of the class definitions proposed by the plaintiffs, and, although this court urged trial courts to consider redefining the scope of the class sua sponte if the proposed definition of the class is too broad, trial courts have no affirmative obligation to do so, as the burden is on the plaintiff, rather than the court, to propose a narrower, certifiable class.

In the present case, the plaintiffs never asked the trial court to redefine the class definition or to create a subclass consisting of plaintiffs who resided at the housing complex between 2018 and 2019, and, in the absence of such a request, the court was not required to rule on that issue.

Argued March 25—officially released July 23, 2024*

*Procedural History*

Action to recover damages for, inter alia, the defendants' allegedly unfair trade practices in the operation of a public housing project, and for other relief, brought to the Superior Court in the judicial district of Hartford and transferred to the Complex Litigation Docket; thereafter, the court, *Noble, J.*, denied the plaintiffs' motion for class certification, and the plaintiffs appealed. *Affirmed.*

*Eric Del Pozo*, with whom were *Sarah E. Dlugoszewski*, *Sarah N. Niemiroski* and, on the brief, *Joette Katz*, *Mark K. Ostrowski*, *Elizabeth Buchanan*, *Alexander T. Taubes* and *James Bergenn*, for the appellants (plaintiffs).

* July 23, 2024, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

*Michele C. Wojcik*, for the appellee (named defendant).

*Frank J. Szilagyi*, with whom, on the brief, was *Adam D. Miller*, for the appellee (defendant Arco Management Corporation).

*William Tong*, attorney general, and *Joshua Perry*, solicitor general, filed a brief for the state of Connecticut as amicus curiae.

*James J. Healy* and *Alinor C. Sterling* filed a brief for the Connecticut Trial Lawyers Association as amicus curiae.

*John W. Cannavino, Jr.*, filed a brief for the Connecticut Defense Lawyers Association as amicus curiae.

*Jeffrey Gentes*, *Anika Singh Lemar*, and *Eric Crouch* and *Cooper Kohnstamm*, law student interns, filed a brief for the Housing Clinic of the Jerome N. Frank Legal Services Organization et al. as amici curiae.

*Opinion*

ECKER, J. This is an interlocutory appeal from the trial court's denial of a motion for class certification. The plaintiffs,[1] former residents of Barbour Gardens, a housing development in the city of Hartford (city), instituted this action in connection with the living conditions at Barbour Gardens during their residency. They sought compensatory and punitive damages and attorney's fees from the owner of Barbour Gardens and its property management company, and alleged various tort, contract, equitable, and statutory claims, including a claim of a violation of a provision of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes

---

[1] The plaintiffs are Latonna Collier and her children (Renee Beckman and Rodnae Beckman), Roleisha Collier and her children (Janiyah Turner and Jordynn Collier), Tasha M. Jordan and her children (Ly'Asia Thompson and Kwan'Asi Levine), Evelyn Jones, and David Merritt.

§ 42-110g. The plaintiffs filed a motion to certify a class on behalf "of all persons who lived at Barbour Gardens for any or all of the time between June 24, 2004, and October 13, 2019," which the trial court denied on the grounds that individualized issues would predominate over class-wide issues and that a class action is not a superior method to resolve the plaintiffs' claims. See Practice Book § 9-8 (3). In this appeal brought pursuant to General Statutes § 42-110h, the plaintiffs contend that there is sufficient evidence in the record common to the entire class to satisfy the predominance and superiority requirements. We reject this claim due to the lengthy period of time for which class certification was requested—covering all residents at Barbour Gardens at any time over a span of more than fifteen years—and the absence of generalized evidence in the record concerning the living conditions at Barbour Gardens during most of the proposed class period. Accordingly, we conclude that the trial court did not abuse its discretion in denying the plaintiffs' motion for class certification.

## I

## BACKGROUND

The record reflects the following facts, which are either undisputed or taken as true for the purpose of the plaintiffs' motion for class certification.[2] Barbour Gardens is a four building, eighty-four unit, federally

---

[2] "In applying the criteria for certification of a class action, the [trial] court must take the substantive allegations in the complaint as true, and consider the remaining pleadings, discovery, including interrogatory answers, relevant documents, and depositions, and any other pertinent evidence in a light favorable to the plaintiff. However, a trial court is not required to accept as true bare assertions in the complaint that [class certification] prerequisites were met. . . . Class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." (Internal quotation marks omitted.) *Standard Petroleum Co.* v. *Faugno Acquisition, LLC*, 330 Conn. 40, 49, 191 A.3d 147 (2018).

subsidized housing complex located in the city's north end neighborhood. The property was owned by the named defendant, Adar Hartford Realty, LLC (Adar), from 2004 until 2019, and managed by the defendant Arco Management Corporation (Arco) from 2005 until at least 2018.[3]

The federal Department of Housing and Urban Development (HUD) subsidized the rental units at Barbour Gardens through the Section 8 Project-Based Rental Assistance (PBRA) program benefiting low income families. See 42 U.S.C. § 1437f (2018). PBRA benefits are tied to a specific property, and recipients cannot move without losing their federal housing subsidy. HUD regulations require the Real Estate Assessment Center (REAC), a unit within HUD's Office of Public and Indian Housing, to inspect Section 8 properties every one to three years. See 24 C.F.R. § 200.857 (b) (1) (2023); see also Economic Growth Regulatory Relief and Consumer Protection Act: Implementation of National Standards for the Physical Inspection of Real Estate (NSPIRE), 88 Fed. Reg. 30,442, 30,492 (May 11, 2023) (to be codified at 24 C.F.R. § 5.705 (c) (2024)). REAC inspectors may award inspection scores ranging from 1 to 100, and any score below 60 is considered deficient. See Consolidated and Further Continuing Appropriation Act, 2015, Pub. L. No. 113-235, § 226 (a), 128 Stat. 2130, 2755. A score below 30 may result in the imposition of civil penalties or the abatement of the Section 8 contract. See id., § 226 (b) (2) (A) and (B), 128 Stat. 2755.

Under the defendants' stewardship, Barbour Gardens fell into a state of egregious disrepair. The defendants were aware of the poor condition of the property and, beginning as early as 2015, "successfully availed them-

---

[3] The defendants also include the following individual members of Adar, who did not file a brief in the present appeal: Saied Soleimani, Albert Soleimani, and Vivid Management, LLC. All references to the defendants are solely to Adar and Arco.

selves of the ability to reschedule inspections in order to pass inspections." For example, an email communication between Arco employees dated March 4, 2015, reflects their efforts to delay a REAC inspection scheduled for April 17, 2015, because the employees believed that, if the property was inspected on that date, it would fail inspection with a score of "about a 15c" out of 100.[4] The REAC inspection was rescheduled for August 29, 2015, and, after an Arco employee again expressed concern that, if the property was inspected "[o]n that day [it] would get a FAIL," the inspection ultimately was postponed until October 1, 2015.[5]

Barbour Gardens was inspected again by REAC inspectors in February, 2018. Prior to the 2018 inspection, Arco employees were aware that "[a]lmost 100 [percent] of [the] windows" were "impossible to lock," causing "a pretty big security issue" and "a tremendous" loss of heat. One Arco employee described Barbour Gardens as "a mold and cockroach infested slum with major plumbing leaks all over the property" and as "[m]issing shower walls, etc." To pass inspection, Arco employees decided to take about one "half the place . . . [offline]," meaning to exempt it from inspection. Despite these problems, Barbour Gardens received a passing score of 81 out of 100 on its REAC inspection.

Local community activists and Barbour Gardens residents knew that the score did not reflect the true conditions at Barbour Gardens. Due to pressure from the community, the Licenses and Inspections Division of

---

[4] According to HUD, "[t]he [lowercase] letter 'c' is given if one or more exigent/fire safety (calling for immediate attention or remedy) [health and safety] deficiencies were observed." United States Dept. of Housing and Urban Development, Physical Inspection Summary Report (Ver 2.3), available at https://www.hud.gov/program offices/public indian housing/reac/products/pass/pass isrpt (last visited July 22, 2024).

[5] There are no factual allegations or evidence in the record as to the results of the 2015 inspection.

the city's Department of Development Services inspected the property on September 12, 2018. The city inspection uncovered more than 200 violations of the Hartford Municipal Code,[6] including (1) "[b]owing, deflected or sagging floors," (2) "[w]ater damaged ceilings," (3) "[w]ater damaged walls," (4) "[m]ice infestations," (5) "[b]edbug infestations," (6) "[r]oach infestations," (7) "[f]lea infestations," (8) "[i]noperable electric[al] out-lets," (9) "[t]hermostats in disrepair," (10) "[i]noperable heating facilities," (11) "[b]roken or inoperable appli-ances," (12) "[p]eeling paint," (13) "[d]oors that will not latch," (14) "[w]indows that will not stay open," (15) "[m]issing window screens," and (16) "[i]mproperly installed plumbing fixtures, including dysfunctional toilets."

On October 17, 2018, the city's fire marshal inspected Barbour Gardens to evaluate the safety of the building. The fire marshal discovered that emergency exit lights were not operational, apartment doors did not close, smoke alarms were missing from apartments, and there were no maintenance records for the property's fire system. The fire alarm panels were not operational, and a Barbour Gardens maintenance staff member asserted that he had never seen them operational. Due to the significant risk to the residents' health and safety posed by fire, the fire marshal placed Barbour Gardens on an around-the-clock fire watch.[7]

---

[6] HUD regulations require subsidized housing under the PBRA program to comply with all "[s]tate or local housing codes . . . ." Economic Growth Regulatory Relief and Consumer Protection Act: Implementation of National Standards for the Physical Inspection of Real Estate (NSPIRE), 88 Fed. Reg. 30,442, 30,492 (May 11, 2023) (to be codified at 24 C.F.R. § 5.703 (f) (2) (2024)); see also id., 30,498 (to be codified at 24 C.F.R. § 200.850 (2024)).

[7] In March, 2019, the fire marshal conducted another inspection of Barbour Gardens, during which new code violations were found. The fire marshal intensified the fire watch, assigning four individuals to monitor the property at all times to ensure that, in the event of a fire, residents were ade-quately warned.

HUD scheduled another REAC inspection for October 30, 2018. Prior to this inspection, one Arco employee predicted that Barbour Gardens "will come back as possibly the lowest score ever received." This prediction proved accurate; Barbour Gardens received a score of 9c—the lowest score received by any project in Connecticut's history. During the inspection of 20 rental units, 138 health and safety deficiencies were observed, including electrical hazards, inoperable windows and doors, mold and mildew, water damage, and a bedbug infestation. REAC inspectors noted that, "[i]f all buildings and units were inspected, it is projected that a total of 423 health and safety deficiencies would apply to the property." Because the residents at Barbour Gardens were "not receiving the quality of housing to which they [were] entitled," REAC referred Barbour Gardens to HUD's Departmental Enforcement Center for an enforcement action.

The defendants did not correct any of the deficiencies documented by the city or the REAC inspectors. As a result, the city instituted criminal proceedings against the owners of Barbour Gardens, and HUD cancelled Barber Gardens' participation in the PBRA program. The residents of Barbour Gardens no longer were eligible to receive a project based federal subsidy and needed to find new housing. Given the limited number of housing units that qualify for federal subsidies, the low income residents at Barbour Gardens struggled to find affordable housing. Many residents who had nowhere else to go were forced to remain at Barbour Gardens, despite the deplorable living conditions.

In June, 2019, three feet of standing waste water flooded into the basement of one of Barbour Gardens' four buildings. The plumbing system pumped the sewage from one building into another. As a result, the city evacuated the families who had remained at Barbour Gardens while awaiting the opportunity to transition

to safe and habitable affordable housing. HUD deemed the property too unsafe for residents to return, and these families were permanently displaced.

The plaintiffs filed the present putative class action "on behalf of all persons who resided at Barbour Gardens between 2004 and 2019 who were adversely affected by the defendants' pattern and practice of disregarding the health and safety of residents." The operative complaint raises the following nine claims against the defendants: fraud, recklessness, negligence, negligent infliction of emotional distress, breach of lease, breach of the warranty of habitability, breach of the management agreement between Adar and Arco (to which the plaintiffs claimed to be third-party beneficiaries), unjust enrichment, and a violation of CUTPA. In their request for relief, the plaintiffs sought compensatory and punitive damages, and reasonable attorney's fees.[8] The defendants denied the plaintiffs' claims and raised various affirmative defenses, such as expiration of the applicable statutes of limitations, the plaintiffs' alleged breach of their respective leases, the doctrine of unclean hands, and that the high crime rate in the

---

[8] The nature and type of damages sought differed for the various counts. As to the fraud count, the plaintiffs claimed that they were entitled to punitive and compensatory damages for, "among other things, emotional distress, anxiety, and frustration . . . ." In connection with their recklessness claim, the plaintiffs sought punitive and compensatory damages for "[t]he distress caused by the conditions and resulting displacement." With respect to their claims of negligence and negligent infliction of emotional distress, the plaintiffs requested compensatory damages for unspecified injuries, including emotional distress that "has resulted and might result in the future illness [of] or bodily harm to the plaintiffs and members of the [class]." The plaintiffs sought rent abatement on their contract claims (breach of lease, breach of the warranty of habitability, and breach of the management agreement). As for their equitable claim for unjust enrichment, the plaintiffs alleged that they were entitled "to restitution and . . . disgorgement . . . ." Finally, as to the CUTPA count, the plaintiffs asked for punitive and compensatory damages, and reasonable attorney's fees, under § 42-110g.

neighborhood was a superseding, intervening cause of the plaintiffs' injuries.

The plaintiffs moved to certify the proposed class, consisting "of all persons who lived at Barbour Gardens for any or all of the time between June 24, 2004, and October 13, 2019," for each of the nine counts alleged in the operative complaint. The defendants opposed the plaintiffs' motion for class certification. They argued, among other things, that the plaintiffs had failed to meet the requirements of predominance and superiority in Practice Book § 9-8 (3) because individualized proof would be required to demonstrate (1) the condition of each plaintiff's apartment, (2) that the defendants' alleged misconduct caused that condition, (3) that each plaintiff suffered an injury as a result, and (4) the amount of damages.

The trial court denied the plaintiffs' motion for class certification, concluding that, although the plaintiffs had satisfied the numerosity, commonality, typicality, and adequacy of representation requirements in Practice Book § 9-7,[9] they had failed to satisfy the predominance and superiority requirements in Practice Book § 9-8 (3). With respect to predominance, the trial court reasoned that "[t]he determination of whether each unit was rendered uninhabitable is necessarily uniquely fact-specific" and "dependent on a number of individualized factors that include the nature and severity of the

[9] With respect to numerosity, the trial court found that the proposed class, which might exceed 300 people, was sufficiently numerous to make it impractical to hold separate trials, particularly because of the lack of financial resources of the class members. The court found that the commonality factor had been "met because the plaintiffs allege[d] a systemic disregard for, and underfunding of, the maintenance and repair of Barbour Gardens . . . ." The "same systemic disregard for, and underfunding of, the maintenance and repair of Barbour Gardens" fulfilled the typicality requirement. Lastly, the court concluded that class counsel was qualified to conduct the litigation and that the plaintiffs were adequate class representatives.

defect, the degree to which it impinges on the tenant's safety, the duration of the defect's existence, the period in which the defect was present, and its relation to other potential defects." The trial court further determined "that superiority is not present due to the highly individualized proof required to establish liability."[10]

Although the trial court denied the plaintiffs' motion for class certification, it recognized, at least with respect to some of the plaintiffs' claims, that there may be "a basis for class certification for some of the discrete events alleged, such as the sewage backup resulting in the tenants' evacuation, the systemic failure of the fire system and alarm panels, as well as [a] sinkhole in the common area . . . ." As part of this observation, the trial court noted that the plaintiffs' flawed request for "a broad [class] certification for tenants over a period of many years, including all past tenants, and for a myriad of defects unrelated to these conditions," could be "cured by amendment" of the operative complaint. The plaintiffs, however, did not seek to file an amended complaint or to certify a narrower class of plaintiffs. Instead, they filed this interlocutory appeal.[11]

On appeal, the parties renew the arguments they made in the trial court. During oral argument before this court, counsel for the plaintiffs acknowledged that the trial court may have had doubts about whether there was generalized evidence of the defendants' alleged misconduct prior to 2015, or whether there was a cogni-

---

[10] In its memorandum of decision on the plaintiffs' motion for class certification, the trial court stated that, because the predominance requirement had not been met, "it need not address . . . superiority." After filing the present appeal, the plaintiffs sought an articulation of the legal and factual basis for the court's decision regarding superiority. The court granted the plaintiffs' motion for articulation and issued a written memorandum of decision explicating its ruling on superiority, which we have summarized.

[11] The plaintiffs appealed from the decision of the trial court to the Appellate Court pursuant to § 42-110h, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

zable class prior to 2018, but argued that the trial court was required to resolve these doubts in favor of class certification by narrowing and redefining the proposed class. Counsel for Adar responded that, because the plaintiffs had not sought to certify a narrower class of residents, the trial court properly ruled on the plaintiffs' motion for class certification as pleaded. Counsel for Adar also pointed out that a redefined class would be significantly smaller in size and, thus, might not meet the numerosity requirement. Counsel for Arco echoed this viewpoint, arguing that the plaintiffs had moved to certify an overly broad class of residents and that redefinition of the proposed class had not been raised in the trial court. Following oral argument, we ordered the parties to file supplemental briefs addressing "whether the trial court [had] abused its discretion by not considering whether to redefine the proposed class sua sponte before denying the plaintiffs' motion for class certification."

We conclude that, although trial courts have the discretion under our rules of practice to redefine a proposed class sua sponte and ordinarily should consider whether a redefined class would warrant certification, even if redefinition is not formally requested by a party, the trial court is not obligated to do so in the absence of such a request. After examining the briefs and arguments submitted by the parties and the amici curiae,[12] and the evidence in the record, we further conclude that the trial court did not abuse its discretion by denying class certification with respect to the class defined in the plaintiffs' motion.

## II

## CLASS ACTIONS

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the

---

[12] The following entities participated in the present appeal as amici curiae: the Connecticut Defense Lawyers Association, the Connecticut Trial Law-

individual named parties only." (Internal quotation marks omitted.) *Wal-Mart Stores*, *Inc.* v. *Dukes*, 564 U.S. 338, 348, 131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011). Class actions "promote judicial economy and efficiency," "protect defendants from inconsistent obligations," "protect the interests of absentee parties," and "provide access to judicial relief" for plaintiffs with small, individual claims. (Emphasis omitted; internal quotation marks omitted.) *Rivera* v. *Veterans Memorial Medical Center*, 262 Conn. 730, 735, 818 A.2d 731 (2003). "For [low income] groups in particular, aggregating claims has provided significant access to justice, as individual members of these groups may be in a poor position to seek legal redress, either because they do not know enough or because such redress is disproportionately expensive. Equally important, class actions can secure relief that is not only [longer lasting] but also [broader based], of critical importance to communities that are constantly confronted with nefarious business practices." (Footnote omitted; internal quotation marks omitted.) M. Gilles, "Class Warfare: The Disappearance of Low-Income Litigants from the Civil Docket," 65 Emory L.J. 1531, 1535–36 (2016). Class actions "serve a unique function in vindicating plaintiffs' rights"; *Rivera* v. *Veterans Memorial Medical Center*, supra, 735; and provide low income individuals who are unlikely to file an individual action "an opportunity for relief." *Rodriguez* v. *Kaiaffa*, *LLC*, 337 Conn. 248, 289, 253 A.3d 13 (2020); see *Amchem Products*, *Inc.* v. *Windsor*, 521 U.S. 591, 617, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997) ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.

yers Association, the Housing Clinic of the Jerome N. Frank Legal Services Organization, the Connecticut Fair Housing Center, and the state of Connecticut.

A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor." (Internal quotation marks omitted.)).

In determining whether to certify a class under our rules of practice, a trial court must follow a two step process. "First, a court must ascertain whether the four prerequisites to a class action, as specified in Practice Book § 9-7, are satisfied. These prerequisites are: (1) numerosity—that the class is too numerous to make joinder of all members feasible; (2) commonality—that the members have similar claims of law and fact; (3) typicality—that the [representative] plaintiffs' claims are typical of the claims of the class; and (4) adequacy of representation—that the interests of the class are protected adequately." (Internal quotation marks omitted.) *Artie's Auto Body, Inc.* v. *Hartford Fire Ins. Co.*, 287 Conn. 208, 213–14, 947 A.2d 320 (2008).

If these prerequisites have been met, the court then proceeds to the second step and evaluates "whether the certification requirements of Practice Book § 9-8 are satisfied. These requirements are: (1) predominance—that questions of law or fact common to the members of the class predominate over any questions affecting only individual members; and (2) superiority—that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. . . . Because our class certification requirements are similar to those embodied in rule 23 of the Federal Rules of Civil Procedure, and our jurisprudence governing class actions is relatively undeveloped, we look to federal case law for guidance in construing the provisions of Practice Book §§ 9-7 and 9-8." (Footnote omitted; internal quotation marks omitted.) Id., 214–15.

The burden is on the party moving for class certification to establish that the requirements of Practice Book

§§ 9-7 and 9-8 have been met, and the trial court should undertake "a rigorous analysis" to ensure that class certification is appropriate. (Internal quotation marks omitted.) *Standard Petroleum Co.* v. *Faugno Acquisition, LLC*, 330 Conn. 40, 48, 191 A.3d 147 (2018); accord *Rodriguez* v. *Kaiaffa, LLC*, supra, 337 Conn. 256; *Collins* v. *Anthem Health Plans, Inc.*, 275 Conn. 309, 320–21, 880 A.2d 106 (2005). In conducting its analysis, the trial court must accept the substantive allegations in the complaint but may go beyond the pleadings when determining whether the requirements for class certification have been satisfied. *Collins* v. *Anthem Health Plans, Inc.*, supra, 321. Class certification does not depend on "whether the . . . plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of [the class action rules] are met." (Internal quotation marks omitted.) Id. Although a trial court has broad discretion in determining whether to certify a class action, it should resolve all doubts regarding the propriety of class certification in favor of certification. Id.

A

Predominance and Superiority

The dispute in the present case centers on the predominance and superiority requirements, which we have described as "intertwined . . . ." (Internal quotation marks omitted.) *Rodriguez* v. *Kaiaffa, LLC*, supra, 337 Conn. 280. "[T]he fundamental purpose of the predominance inquiry is to determine whether the economies of class action certification can be achieved . . . without sacrificing procedural fairness or bringing about other undesirable results." (Internal quotation marks omitted.) *Collins* v. *Anthem Health Plans, Inc.*, supra, 275 Conn. 329. This inquiry substantially encompasses the superiority analysis because the fundamental purpose of the superiority requirement is to ensure that a

class action is the most "fair and efficient" means of resolving the case. Practice Book § 9-8 (3). Because these two requirements overlap, "[i]f the predominance criterion is satisfied, courts generally will find that the class action is a superior mechanism even if it presents management difficulties." *Collins* v. *Anthem Health Plans, Inc.*, supra, 347. Conversely, if the predominance requirement is not satisfied, a class action likely will not be the superior mechanism to resolve the dispute between the parties due to "the management difficulties posed by the individual questions . . . ." (Internal quotation marks omitted.) Id. In the present case, the fulfillment of these two requirements depends on the prevalence of class-wide issues, and, therefore, we consider these requirements together. See, e.g., *Rodriguez* v. *Kaiaffa, LLC*, supra, 277.

Class-wide issues predominate over individualized issues "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." (Emphasis omitted; internal quotation marks omitted.) *Collins* v. *Anthem Health Plans, Inc.*, supra, 275 Conn. 329. The focus is on whether class-wide issues have "a direct impact on every class member's effort to establish liability . . . ." (Internal quotation marks omitted.) Id., 330. If the plaintiffs cannot establish liability without introducing "a great deal of individualized proof or argu[ing] a number of individualized legal points to establish most or all of the elements of their individual[ized] claims, such claims are not suitable for class certification . . . ." (Internal quotation marks omitted.) Id.; accord *Rodriguez* v. *Kaiaffa, LLC*, supra, 337 Conn. 279; *Standard Petroleum Co.* v. *Faugno Acquisition, LLC*, supra, 330 Conn. 60–61; *Art-*

*ie's Auto Body, Inc.* v. *Hartford Fire Ins. Co.*, supra, 287 Conn. 215–16.

The need for individualized proof to adjudicate defenses or to establish the amount of damages to which each class plaintiff is entitled does not necessarily defeat class certification. See, e.g., *Standard Petroleum Co.* v. *Faugno Acquisition, LLC*, supra, 330 Conn. 71; *Collins* v. *Anthem Health Plans, Inc.*, supra, 275 Conn. 330. "The existence of special defenses, which may or may not be subject to common proof, is merely another factor to be considered in [the predominance] assessment." *Standard Petroleum Co.* v. *Faugno Acquisition, LLC*, supra, 71. With respect to damages, class certification is appropriate if the plaintiffs can rely on "plausible statistical or economic methodologies to demonstrate impact on a class-wide basis. . . . Particularly [when] damages can be computed according to some formula, statistical analysis, or other easy or essentially mechanical methods, the fact that damages must be calculated on an individual basis is no impediment to class certification." (Citation omitted; internal quotation marks omitted.) *Collins* v. *Anthem Health Plans, Inc.*, supra, 331; see also *Roach* v. *T.L. Cannon Corp.*, 778 F.3d 401, 408 (2d Cir. 2015) ("it remains the black letter rule that a class may obtain certification under [r]ule 23 (b) (3) [of the Federal Rules of Civil Procedure] when liability questions common to the class predominate over damages questions unique to class members" (internal quotation marks omitted)).

To determine whether class-wide issues of law or fact predominate in any given case, the trial court must undertake a three part inquiry. "First, the court should review the elements of the causes of action that the plaintiffs seek to assert on behalf of the putative class. . . . Second, the court should determine whether generalized evidence could be offered to prove those elements on a class-wide basis or whether individualized

proof will be needed to establish each class member's entitlement to monetary or injunctive relief. . . . Third, the court should weigh the common issues that are subject to generalized proof against the issues requiring individualized proof in order to determine which predominate. . . . Only when common questions of law or fact will be the object of most of the efforts of the litigants and the court will the predominance test be satisfied." (Citations omitted; internal quotation marks omitted.) *Collins* v. *Anthem Health Plans, Inc.*, supra, 275 Conn. 331–32.

B

Analysis

The operative complaint asserts causes of action for fraud, recklessness, negligence, negligent infliction of emotional distress, breach of lease, breach of the warranty of habitability, breach of the management agreement, unjust enrichment, and a violation of CUTPA. Although the essential elements of each of these causes of action differ, the facts on which the plaintiffs rely to support their claims are the same, namely, the defendants' alleged failure to maintain Barbour Gardens in a safe and habitable condition and their pattern and practice of delaying REAC inspections, concealing the health and safety hazards at Barbour Gardens, and violating federal, state, and local housing laws. Because "both the factual and legal issues raised by the class certification order as to both the CUTPA and non-CUTPA counts are inextricably intertwined with each other," we address the plaintiffs' CUTPA and non-CUTPA claims collectively in this interlocutory appeal. *Collins* v. *Anthem Health Plans, Inc.*, 266 Conn. 12, 29, 836 A.2d 1124 (2003); see, e.g., *Standard Petroleum Co.* v. *Faugno Acquisition, LLC*, supra, 330 Conn. 43 n.1; *Macomber* v. *Travelers Property & Casualty Corp.*, 277 Conn. 617, 620, 894 A.2d 240 (2006).

To support their claims, the plaintiffs primarily rely on evidence in the defendants' own records, namely, communications between their employees beginning in 2015 regarding the defendants' efforts to delay inspections and to hide housing code violations, as well as the multiple 2018 inspection reports documenting the squalid living conditions at the property, and evidence of the 2019 sewage backup and permanent relocation of all Barbour Gardens residents. As the trial court recognized, this generalized evidence "may pose a basis for class certification" for the residents of Barbour Gardens during 2018 and 2019 with respect to some claims, but the plaintiffs sought "a broad certification for tenants over a period of many years, including all past tenants" going back to 2004. For many past residents during this proposed class period, there is no generalized evidence in the record regarding the allegedly uninhabitable conditions at Barbour Gardens or the defendants' misconduct. In light of the absence of such evidence prior to 2015 at the earliest, the vast majority of the proposed class members would need to adduce individualized proof to establish the defendants' liability, and there is no evidentiary basis to support the conclusion that "common questions of law or fact will be the object of most of the efforts of the litigants and the court . . . ." (Internal quotation marks omitted.) *Collins* v. *Anthem Health Plans, Inc.*, supra, 275 Conn. 332. Thus, the proposed class of plaintiffs is overbroad, and the predominance requirement is not satisfied. See, e.g., *Mazza* v. *American Honda Motor Co.*, 666 F.3d 581, 596 (9th Cir. 2012) (concluding that class-wide issues did not predominate over individualized issues because class definition was overbroad), overruled in part on other grounds by *Olean Wholesale Grocery Cooperative, Inc.* v. *Bumble Bee Foods, LLC*, 31 F.4th 651 (9th Cir.), cert. denied sub nom. *StarKist Co.* v. *Olean Wholesale Grocery Cooperative, Inc.*,    U.S.    , 143 S. Ct. 424, 214

L. Ed. 2d 233 (2022); *Circle Click Media, LLC* v. *Regus Management Group, LLC*, Docket No. 3:12-CV-04000-SC, 2015 WL 6638929, *12–14 (N.D. Cal. October 30, 2015) (same). See generally *Babineau* v. *Federal Express Corp.*, 576 F.3d 1183, 1191 (11th Cir. 2009) (predominance requirement is not met, and "[c]ertification is inappropriate if the plaintiffs must . . . introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims" (internal quotation marks omitted)).

The plaintiffs argue that, even if the record provides no basis to justify a class period going back to 2004, the trial court nonetheless erred in denying their motion for class certification because the court had an affirmative obligation to certify the "readily" ascertainable and narrower "class of those tenants who resided [at] Barbour Gardens from late 2018 onward." The defendants respond that, although the trial court had the discretion to redefine the class sua sponte, it did not abuse its discretion by declining to do so because the burden is on the plaintiffs, not the trial court, to propose a narrower certifiable class. We agree with the defendants. Although we urge trial courts sua sponte to consider redefining the scope of the class if the proposed definition in the operative complaint and motion for class certification is overbroad, we agree with the defendants that the trial court does not abuse its discretion when it does not do so.

Our rules of practice, like rule 23 of the Federal Rules of Civil Procedure, vest the trial court with broad discretion to make class certification decisions. This broad discretion encompasses the authority "to control proceedings and frame issues for consideration . . . ." (Internal quotation marks omitted.) *Standard Petroleum Co.* v. *Faugno Acquisition, LLC*, supra, 330 Conn. 50. The trial court also can certify a partial class action

or create subclasses with respect to discrete issues. See, e.g., *Collins* v. *Anthem Health Plans, Inc.*, supra, 266 Conn. 25 ("our rules of practice . . . permit the partial class action mechanism" and creation of subclasses); see also Practice Book § 9-9 (a) (4) ("[w]hen appropriate, (A) an action may be brought or maintained as a class action with respect to particular issues, or (B) a class may be divided into subclasses and each subclass treated as a class"). A trial court's discretion to manage the class is ongoing, and "it is within the purview of the trial court to revisit the issue of class certification, and, if facts require, to alter the definition of the class as developments dictate . . . ." *Rivera* v. *Veterans Memorial Medical Center*, supra, 262 Conn. 739; see *Collins* v. *Anthem Health Plans, Inc.*, supra, 266 Conn. 40 ("the trial court is authorized to monitor developments bearing on the propriety of its class certification orders . . . and to amend those orders in light of subsequent developments"); see also Practice Book § 9-9 (a) (1) (C) (class certification order "may be altered or amended before final judgment"). "Under both the federal rule and our similar rule, a trial court's order respecting class status is not final or irrevocable, but rather, it is inherently tentative . . . because the court remains free to modify it . . . ." (Citation omitted; internal quotation marks omitted.) *Collins* v. *Anthem Health Plans, Inc.*, supra, 266 Conn. 40.

Given the breadth of the trial court's discretion, it clearly has the authority to limit or modify the scope of the class definitions proposed by the plaintiffs "to provide the necessary precision." *In re Monumental Life Ins. Co.*, 365 F.3d 408, 414 (5th Cir.), cert. denied sub nom. *American National Ins. Co.* v. *Bratcher*, 543 U.S. 870, 125 S. Ct. 277, 160 L. Ed. 2d 117 (2004); see, e.g., *Rodriguez* v. *Kaiaffa, LLC*, supra, 337 Conn. 290 n.29 (recognizing that "the trial court may deem it advisable to amend the [class] definition . . . on remand").

This authority permits the trial court to act sua sponte when exercising its discretion to redefine the class as appropriate. As the United States Court of Appeals for the Second Circuit has recognized, "[a] court is not bound by the class definition proposed in the complaint and should not dismiss the action simply because the complaint seeks to define the class too broadly. . . . [Although] the court need not take on an onerous burden of identifying issues that may be appropriate for [class action] treatment or of constructing subclasses," it should narrow and redefine the class if doing so does not impose an "undue burden  . . . ." (Citation omitted.) *Robidoux* v. *Celani*, 987 F.2d 931, 937 (2d Cir. 1993); see *Messner* v. *Northshore University Health-System*, 669 F.3d 802, 825 (7th Cir. 2012) (problems with class definition "can and often should be solved by refining the class definition rather than by flatly denying class certification on that basis"); *In re Monumental Life Ins. Co.*, supra, 414 ("holding [the] plaintiffs to the plain language of their [class] definition would ignore the ongoing refinement and give-and-take inherent in class action litigation, particularly in the formation of a workable class definition"); *Finberg* v. *Sullivan*, 634 F.2d 50, 64 n.9 (3d Cir. 1980) ("[t]he [trial] court should not deny certification on account of [overbreadth] problems without considering the possibility of redefining the classes").

There is one important caveat to these observations, which defeats the plaintiffs' argument that the trial court erred by failing to narrow the class period in the present case. Although the trial court can and should on its own initiative consider modifying the proposed class if such a modification can be made without imposing an undue burden on the court, it has no affirmative obligation to do so. See *United States Parole Commission* v. *Geraghty*, 445 U.S. 388, 408, 100 S. Ct. 1202, 63 L. Ed. 2d 479 (1980) ("[I]t is not the [trial] [c]ourt that

is to bear the burden of constructing subclasses. That burden is [on] the [plaintiff] and it is [the plaintiff] who is required to submit proposals to the court. The court has no sua sponte obligation so to act."); *Rogers* v. *Epson America, Inc.*, 648 Fed. Appx. 717, 719 (9th Cir. 2016) (rejecting plaintiff's claim "that the [trial] court abused its discretion when it did not sua sponte redefine the proposed class and certify that" in light of "the principle that the burden of proposing a narrower class was [the plaintiff's], and not that of the [trial] court"); *Heaven* v. *Trust Co. Bank*, 118 F.3d 735, 738 (11th Cir. 1997) (following denial of class certification, "[t]he [trial] court has no sua sponte obligation to subclassify; it is the plaintiff's burden to designate an appropriate class"); *Borum* v. *Brentwood Village, LLC*, 324 F.R.D. 1, 8 (D.D.C. 2018) ("When appropriate, [trial] courts may redefine classes or subclasses sua sponte prior to certification. . . . Because it is the plaintiff, and not the court, who bears the burden of fashioning appropriate class definitions and demonstrating that the requirements of [r]ule 23 [of the Federal Rules of Civil Procedure] are met for each, it is left to the court's discretion to choose whether to intervene in this way." (Citations omitted.)). A trial court, in short, is not *required* to redefine a proposed class "on its own initiative," and its "refusal to shoulder what, in the final analysis, is [the] plaintiff's burden cannot be regarded . . . as an abuse of discretion." *Lundquist* v. *Security Pacific Automotive Financial Services Corp.*, 993 F.2d 11, 14–15 (2d Cir.), cert. denied, 510 U.S. 959, 114 S. Ct. 419, 126 L. Ed. 2d 365 (1993).

Consistent with the foregoing federal authority, we conclude that the trial court did not abuse its discretion by denying the plaintiffs' motion to certify a class of plaintiffs consisting of all residents at Barbour Gardens between the dates of June 24, 2004, and October 13, 2019, without first considering, on its own initiative,

whether to modify the scope of the proposed class. The plaintiffs never asked the trial court to redefine the class definition or to create a subclass consisting of plaintiffs who resided at Barbour Gardens between the years of 2018 and 2019, and, in the absence of such a request, the trial court was not required to rule on that issue. Accordingly, we affirm the trial court's denial of the plaintiffs' motion for class certification.[13]

The judgment is affirmed.

In this opinion the other justices concurred.

———————————

[13] Federal courts have held that, when class certification is denied because the proposed class definition is overbroad, the movant must be given a reasonable opportunity to propose a narrower class or subclasses that are certifiable. See, e.g., *United States Parole Commission* v. *Geraghty*, supra, 445 U.S. 408 (on remand, plaintiff must be afforded opportunity to request subclasses after proposed class was initially rejected); *Heaven* v. *Trust Co. Bank*, supra, 118 F.3d 738 ("[when] the . . . plaintiff has no real opportunity to request certification of subclasses after his proposed class is rejected, an obligation arises for the [D]istrict [C]ourt to consider subclassification"); *Quintana* v. *Harris*, 663 F.2d 78, 79–80 (10th Cir. 1981) (proposed class was overbroad, but plaintiff must be given reasonable opportunity to propose subclasses after denial of class certification when denial is based on structuring of class and when problems with broad class might be remedied by forming subclasses). Our affirmance of the trial court's denial of class certification does not preclude the plaintiffs on remand from seeking to certify a narrower class or subclasses, because "class certification [decisions] are always interlocutory" and "may be altered or amended at a later date . . . ." (Citations omitted; internal quotation marks omitted.) *Salazar-Calderon* v. *Presidio Valley Farmers Assn.*, 765 F.2d 1334, 1349–50 (5th Cir. 1985), cert. denied sub nom. *Presidio Valley Farmers Assn.* v. *Calderon*, 475 U.S. 1035, 106 S. Ct. 1245, 89 L. Ed. 2d 353 (1986); see *Alger* v. *Dept. of Labor & Industry*, 181 Vt. 309, 328–29, 917 A.2d 508 (2006) (upholding trial court's denial of motion for class certification as overbroad but explaining that "[the] plaintiffs are not barred from seeking certification of a more precisely defined class" on remand). We express no opinion on the merits of any such motion should it be filed.